E. Michelle Drake*
emdrake@bm.net
John G. Albanese*
jalbanese@bm.net
Ariana B. Kiener*
akiener@bm.net
Marika K. O'Connor Grant*
moconnorgrant@bm.net
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
T. 612.594.5999
F. 612.584.4470
*pro hac vice forthcoming

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| HEATHER JAMES, on behalf of herself and all others similarly situated, | |
| Plaintiff, | Case No.    4:25-cv-00024 |
| v. | **Jury Trial Demanded** |
| ERIC LOCHEN; MINERAL POINT CONSULTING SERVICES; CREDITSERVE, INC.; ERIC WELCH; JAY MCGRAW; SHANE THIN ELK; LORI BAKER; CHARLIE TITUS, JR.; LINDBERG CHARLIE; JONATHAN DAVID, SR.; and JOHN DOES 1 - 40, | |
| Defendants. | |

## <u>CLASS ACTION COMPLAINT</u>

1

*James v. Lochen, et al.*, No.

Plaintiff Heather James ("Plaintiff"), on behalf of herself and all individuals similarly situated, by counsel, brings this class action to secure redress from predatory and unlawful loans made by: (i) Defendants Eric Lochen ("Lochen") and Mineral Point Consulting Services ("Mineral Point") (collectively, the "Lochen Defendants"); (ii) Defendants Eric Welch ("Welch"), Jay McGraw ("McGraw"), and CreditServe, Inc. ("CreditServe") (collectively, the "CreditServe Defendants"); (iii) Defendant Shane Thin Elk ("Thin Elk," and, together with the Lochen Defendants and the CreditServe Defendants, the "Non-Tribal Defendants"); (iv) Defendants Lori Baker, Charlie Titus, Jr., Lindberg Charlie, and Jonathan David, Sr. (collectively, the "Tribal Defendants"); and (iv) John Does, 1-40 (when together with the Non-Tribal Defendants and the Tribal Defendants, "Defendants").

## GENERAL ALLEGATIONS

1. For a consumer who has bad credit or no credit, a high-interest, short-term loan—which can hit the consumer's bank account almost immediately, without the need for a traditional credit check—can seem like their only option to finance an unexpected expense, like a broken-down car or medical emergency. And this is precisely why the lenders behind these loans can get away with charging eye-popping interest rates: the lenders know that their target borrowers need money, now, no matter the long-term cost.

2. As it turns out, that cost is often devastating. When a consumer takes out a high-interest loan, they end up paying back many times more than what they borrowed. Worse yet, once saddled with such a predatory loan, the borrower is often forced to take out another high-interest loan—and another, and another—to make ends meet and pay off

their debts. This creates a cycle of mounting debt for the consumer. High-interest, short-term loans also create a cycle of mounting profits for the predatory lenders who make them.

3. To both protect consumers from the vicious cycle of high-interest loans, and to deter lenders from issuing these harmful loans, most states have enacted usury laws to limit the amount of interest a lender can charge on a loan. Forty-five states and the District of Columbia cap annual percentage rates ("APR") for $500 installment loans, with a median rate of 38.5%. For $2,000 installment loans, 43 states and the District of Columbia cap APRs, with a median rate of 32.5%.[1]

4. Unfortunately, because there is so much money to be made off usurious loans, state and federal usury laws have done little to thwart certain predatory and creative lenders.

5. This is a case about a group of clever schemers who came together to circumvent usury laws in order to make online, short-term, small-dollar loans that carry interest rates exceeding **700**%—loans that are patently illegal in most states. This scheme not only takes advantage of vulnerable consumers, but it also exploits Native American tribes.

6. To explain, and as alleged in greater detail herein, the Non-Tribal Defendants have convinced the Tribal Defendants to let them use the Native Village of Minto's (the "Tribe") name as a front for numerous predatory lending enterprises, including one that

---

[1] National Consumer Law Center, *State Rate Caps for $500 and $2,000 Loans*, https://www.nclc.org/resources/state-rate-caps-for-500-2000-loans/ (last visited June 24, 2025).

*James v. Lochell, et al.*, No.

operates under the name Minto Financial d/b/a Minto Money ("Minto Money").

7.     In this so-called "rent-a-tribe" model, the Tribe serves as the face of the scheme. The Non-Tribal Defendants, in turn, attempt to cloak themselves in the Tribe's sovereign immunity, thereby (supposedly) placing them beyond the reach of usury laws.

8.     On its website, Minto Money purports to be a tribal lending business that is owned by Benhti Economic Development Corporation ("BEDCO"), which is "a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto, a federally recognized sovereign American Indian tribe in Alaska."[2]

9.     But, in reality—and as recently confirmed by a revealing court filing in the United States District Court for the Eastern District of Wisconsin—the Tribe and BEDCO have little to do with the operation of Minto Money.

10.     Normally, in an illegal tribal lending scheme like the one at issue here, the non-tribal schemers go to great lengths to cover their tracks and hide their involvement in the operation. For years, that is precisely what the Non-Tribal Defendants did. Then, something changed.

11.     On June 17, 2025, Lochen, via his LLC, Mineral Point, filed suit against BEDCO after BEDCO allegedly failed to pay the Lochen Defendants for two months of "certain consulting services." *Mineral Point Consulting LLC v. Benhti Econ. Dev. Co.*, 2:25-CV-00868 (E.D. Wis.), ECF No. 1 (the "Lochen Complaint," attached hereto as

---

[2] Minto Money, https://mintomoney.com/ (last visited June 26, 2025).

*James v. Lochen, et al.*, No.

Exhibit 1). In doing so, the Lochen Defendants publicly filed their December 3, 2022 "Executive Management Consultant Engagement and Services Agreement" (the "Agreement," Exhibit A to Ex. 1) with BEDCO—a document that details the precise role of many of the non-tribal actors behind the Minto Money scheme.

12. The Agreement confirms what consumers and consumer advocates have long claimed: the Tribe's control over the Minto Money lending enterprise is nothing more than a façade. In fact, under the Agreement, "[BEDCO] explicitly authorizes and approves [the Lochen Defendants] to undertake **all management decisions** on behalf of [Minto Money]." Agreement § 1(e) (emphasis added). The Agreement goes on to identify many of the other non-tribal schemers that, with this authority, the Lochen Defendants have engaged in the Minto Money enterprise, including: the CreditServe Defendants, Mecca Capital, Inc. ("Mecca Capital"), and Next Level Servicing, Inc. ("Next Level Servicing").

13. As set forth in the Agreement, and further herein, it is the Non-Tribal Defendants (and other non-tribal schemers) that provide the infrastructure to market, underwrite, service, fund, and collect Minto Money loans. It is also the Non-Tribal Defendants that primarily profit from these loans, making millions of dollars each month, with only a small portion of the illegal revenues generated flowing to the Tribe.

14. Because the Non-Tribal Defendants and other outsiders—not the Tribe— control Minto Money, the predatory and illegal lending scheme cannot be shielded by the Tribe's laundered sovereign immunity.

15. Plaintiff, on behalf of herself and the Classes set forth below, seeks to recover damages and penalties under state and federal law for the usurious interest and fees

*James v. Lochen, et al.*, No.

obtained by the Non-Tribal Defendants, and also seeks injunctive and declaratory relief against the Tribal Defendants to halt their illegal practices.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

17. This Court also has jurisdiction under the Class Action Fairness Act because Plaintiff and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Minto, Alaska. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because the Tribal Defendants transacted their affairs in this District and Division.

## THE PARTIES

19. Plaintiff Heather James is a natural person, citizen of the State of California, and resident of Stevinson, California.

20. Defendant Eric Lochen is a natural person and citizen of the State of Wisconsin. He is the sole member of Mineral Point. Lochen is not a member of the Tribe.

21. Defendant Mineral Point Consulting Services is a limited liability company formed in the State of Wyoming with a principal place of business located at 6801 Jefferson Street NE, Suite 150 PMB 3150, Albuquerque, New Mexico 87109. Its sole member is Lochen.

*James v. Lochen, et al.*, No.

22.     Defendant Eric Welch is a natural person and citizen of the State of Texas. Welch is the Chief Executive Officer, Secretary, and Chief Financial Officer of CreditServe, Inc. Welch is not a member of the Tribe.

23.     Defendant Jay McGraw is a natural person and citizen of the State of Texas. McGraw previously served as the President of CreditServe. McGraw is not a member of the Tribe.

24.     Defendant CreditServe, Inc., is a corporation organized under the laws of California, with offices at 137 N. Larchmont Blvd., #705, Los Angeles, California 90004 and 1421 Wells Branch Parkway, Pflugerville, Texas 78660.

25.     Defendant Shane Thin Elk is a natural person and citizen of the State of Wisconsin. Thin Elk is not a member of the Tribe.  He was previously associated with Eric Lochen's law firm.

26.     Defendants Lori Baker, Charlie Titus, Jr., Lindberg Charlie, and Jonathan David, Sr., are each a tribal member and Director on the BEDCO Board of Directors. They are each being sued in their official capacity only.

27.     Defendant John Doe Nos. 1-40 are unidentified parties who participated in the enterprise with the Defendants, including, but not limited to, individuals and entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## FACTUAL ALLEGATIONS

**A.     The Emergence of the Tribal Lending Scheme**

28.     Predatory lenders have long searched for cunning ways to evade usury laws.

*James v. Lochen, et al.*, No.

In the latest scheme, a non-tribal actor (or a group of such actors) affiliates with a Native American tribe. The latter serves as the face of and provides formal authority to operate the online lending enterprise—in exchange for a small portion of the revenues generated—while the former actually calls the shots, controlling all substantive aspects of the business such as funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections.

29.     The purpose of the scheme is clear: non-tribal schemers "use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

30.     In other words, because the tribe authorizes the lending operation, the tribe's sovereign legal status and general immunity from suit under federal and state laws protect the operation, insulating its loans from state and federal usury laws. As a result, the non-tribal schemers orchestrating the enterprise—who would normally be subject to usury laws limiting APRs in the low double digits—can issue loans to consumers with triple-digit interest rates.

31.     Tribal lending schemes do not promote tribal businesses or prosperity. Rather, they are contrivances aimed at avoiding state usury laws, with non-tribal entities receiving the vast majority of the businesses' revenue, and the tribes typically receiving only a small share.

32.     And, as with all predatory loans, tribal lending schemes also exploit

*James v. Lochell, et al.*, No.

vulnerable borrowers. As Darrel Frank, the former chief of the Tribe, has admitted, Minto Money, in particular, "[i]s bringing in a lot of money. But it's off the misery of the people on the other end who are taking out these loans."[3]

33. Likewise, one Minto elder, who no longer lives in the community, worries that their former village is being "exploit[ed]." This Minto elder continued: "It is not right taking from poor people to get yourself rich."[4]

34. In recent years, these nefarious schemes have come under increased scrutiny.

35. Perhaps most notably, in October 2017, one prominent perpetrator of a tribal lending scheme, Scott Tucker, was convicted of numerous federal racketeering and truth-in-lending offenses.[5] He was sentenced to 200 months, or more than 16 years, in prison.[6] His attorney was also convicted and sentenced to 84 months in prison for his role in perpetrating the illegal lending scheme.[7]

36. In addition, the Consumer Financial Protection Bureau ("CFPB"),[8] attorneys

---

[3] ProPublica, *A 700% APR Lending Business Tied to Dr. Phil's Son Is Dividing an Alaska Tribe*, https://www.propublica.org/article/minto-money-dr-phil-son-payday-lending-alaska (last visited June 26, 2025).

[4] *Id.*

[5] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise*, https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last visited June 4, 2025).

[6] *Id.*

[7] *Id.*

[8] Consumer Financial Protection Bureau, *CFPB Sues Four Online Lenders for Collecting on Debts Consumers Did Not Legally Owe*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-four-online-lenders-collecting-debts-consumers-did-not-legally-owe/ (last visited June 4, 2025).

*James v. Locheil, et al.*, No.

general,[9] and consumers[10] have filed numerous complaints against online lenders for running illegal tribal lending schemes. Several class actions and government enforcement actions have returned hundreds of millions of dollars to consumers victimized by tribal lending operations, and canceled billions of dollars in outstanding debt.

37.    Unfortunately, however, the threat of litigation and federal enforcement has not stopped all predatory lenders from continuing to use this tribal lending model. Instead, many of these schemers have just gotten better at concealing their involvement.

**B.    The Launch of Minto Money**

38.    "Old Minto, the first origin of the Minto community, is located on the banks of the Tanana River, about 50 miles south of Fairbanks." Ex. 2 at 9. Today, Old Minto is used largely for cultural activities, while "[t]he new village of Minto is located in Interior Alaska on the west bank of the Tolovana River, 130 miles northwest of Fairbanks." *Id.*

39.    According to the 2020 Census, the total population for Minto was 160. *Id.* There are more than 500 enrolled members of the Tribe.[11]

40.    As with many Native American tribes, poverty and unemployment rates in Minto are significantly higher than neighboring areas, with the household income in Minto

---

[9] *See, e.g.*, The Office of Minnesota Attorney General Keith Ellison, *AG Ellison sues to stop predatory internet lending in Minnesota*, https://www.ag.state.mn.us/Office/Communications/2023/11/01_IslandMountain.asp (last visited June 24, 2025).

[10] *See, e.g.*, Top Class Actions, *Historic $1.5B settlement seeks payday loan forgiveness, other relief*, https://topclassactions.com/lawsuit-settlements/money/loans/historic-1-5b-settlement-seeks-payday-loan-forgiveness-other-relief/ (last visited June 24, 2025).

[11]    Minto Development Corporation, *Minto, Alaska*, https://mintodevelopmentcorp.com/minto-alaska/ (last visited June 27, 2025).

*James v. Lochen, et al.*, No.

being about 30% lower than the statewide median.[12]

41.     Years ago, and as "a way to create jobs and bring in much-needed revenue," the Tribe began taking steps to enter the online lending business.[13]

42.     At meetings held in October and November 2018, the Minto Native Village Council (the "Council") chartered BEDCO and appointed the BEDCO Board of Directors ("BEDCO Board"). *See* Ex. 3. According to the BEDCO website, "BEDCO's purpose is to generate revenue and promote economic development and self-sufficiency to significantly benefit the community of the Native Village of Minto."[14]

43.     Soon thereafter, Minto Money launched. On November 12, 2018, the BEDCO Board chartered Minto Financial "as a subsidiary organization," with the BEDCO Board serving as the Board of Directors for Minto Financial. *See* Ex. 3. According to the Minto Money website, "Minto Financial dba Minto Money is a wholly owned subsidiary of Benhti Economic Development Corporation ('BEDCO'), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto…"[15]

44.     Minto Money's original "certificate of licensure," dated June 3, 2019, is signed by Thin Elk.[16] According to the license, Thin Elk is the sole "Commissioner" of the

---

[12] ProPublica, *supra* n.3.

[13] ProPublica, *supra* n.3.

[14] BEDCO, *About Us*, https://www.bedco.us/about-us (last visited June 26, 2025).

[15] Minto Money, https://mintomoney.com/ (last visited June 27, 2025).

[16] Minto Money, *About* (digital archive from Wayback Machine, dated Dec. 1, 2020), https://web.archive.org/web/20201201051527/https://mintomoney.com/about/ (last visited June 27, 2025).

*James v. Lochen, et al.*, No.

"Minto Financial Services Licensing & Regulatory Commission" (the "Commission"), and has issued the license "pursuant to and in accordance with the Tribal Credit Code of the Minto Tribe."[17]

45.     Thin Elk is not a member of the Tribe. Rather, he is an enrolled member of a different Native American tribe located thousands of miles from Alaska, and has previously been fired from a tribal job due to his history of violence.[18]

46.     A few years later, another lending operation under the supposed control of the Tribe—Tolovana Financial dba Birch Lending ("Birch Lending")—was established. Birch Lending's original "certificate of licensure," dated October 14, 2022, is also signed by Thin Elk, and is largely identical to the Minto Money "license."[19]

47.     Like Minto Money, the Birch Lending website claims that, "Tolovana Financial dba Birch Lending is a wholly owned subsidiary of Benhti Economic Development Corporation ('BEDCO'), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto…"[20]

48.     Like so many predatory lending operations before them, both Minto Money and Birch Lending provide consumers with small-dollar loans, with quick approval and

---

[17] *Id.*

[18] Acee Agoyo, *The Sioux Chef under fire for overlooking key employee's violent past*, Indianz.com (July 22, 2022), https://indianz.com/News/2022/07/22/the-sioux-chef-under-fire-for-overlooking-key-employees-violent-past/.

[19] Birch Lending, *About* (digital archive from Wayback Machine, dated Jan. 25, 2024), https://web.archive.org/web/20240125161138/https://www.birchlending.com/About (last visited June 27, 2025).

[20] Birch Lending, https://birchlending.com/ (last visited June 27, 2025).

*James v. Lochen, et al.*, No.

same-day funding, but with a catch: eye-popping interest rates, including rates over 700%.

49. The Tribe claims that it can charge these usurious rates because it enjoys sovereign immunity.

### i. Minto Money Is Managed by Non-Tribal Outsiders

50. From its inception, Minto Money relied on an outside "manager."

51. That is, on November 12, 2018—the very same day that the BEDCO Board chartered Minto Financial—the BEDCO Board also adopted a resolution "whereby the Minto Development Corporation shall provide management and operational support services to BEDCO and all BEDCO Chartered Corporations and Entities, Holdings and Subsidiaries (including, but not limited to, MINTO FINANCIAL)." *See* Ex. 3.

52. For nearly three years, the Minto Development Corporation ("MDC"), an Alaskan corporation, provided third-party management services to Minto Money.

53. However, in September 2021, consumers filed sued against, *inter alia*, Minto Money, BEDCO, MDC, and MDC's Chief Executive Officer, Douglas William Isaacson, alleging that the defendants were involved in an illegal "rent-a-tribe" lending model. *See Holte v. TrueAccord Corp. et al*, No. 8:21-CV-02215 (M.D. Fla.), ECF No. 1, ¶ 2.

54. Soon thereafter, on December 14, 2021, BEDCO terminated its agreement with MDC. *See* Ex. 3. Six days later, on December 20, 2021, Minto Money, BEDCO, MDC, and Mr. Isaacson informed the court that they had reached an individual settlement in the *Holte* matter.

### ii. Minto Money has Brought "Pennies," Few Jobs to the Tribe

*James v. Lochen, et al.*, No.

55.     The Minto Money lending scheme has not brought significant employment or revenue to the Tribe. Indeed, "few people in Minto work for the lending operation."[21]

56.     And members of the Tribe are left wondering where the money from the lending scheme is going, with some "calling for audits, greater transparency and federal investigations" into Minto Money.[22] Even the former chief of the Tribe, Mr. Frank, is advocating for an audit, as well as a halt to the Minto Money enterprise.[23]

57.     Cameron Winfrey, a member of the Tribe who worked for the Minto Money operation, was recently ousted from his role—and even removed from the Council—he believes "because he had started asking too many questions about where the money was going."[24]

58.     Winfrey has since admitted that Minto Money is "a rent-a-tribe thing," with the Tribe getting "pennies" while outside schemers "get all the funds."[25]

### iii.     Since at Least 2022, the Non-Tribal Defendants Have Controlled Minto Money

59.     As the Lochen Complaint makes clear, the Non-Tribal Defendants have been controlling Minto Money since at least December 3, 2022, when the Lochen Defendants and BEDCO entered the Agreement.

---

[21] ProPublica, *supra* n.3.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*

*James v. Lochen, et al.*, No.

60. For years, the Non-Tribal Defendants have successfully concealed their roles in the lending scheme by quickly settling most lawsuits regarding Minto Money, thereby avoiding discovery into the lender's operations.

61. They have also agreed with the Tribe to keep their affiliations with one another a secret. *See* Agreement § 10 ("Neither party shall use the name of the other party or any of its affiliates in any sales or marketing publication or advertisement or make any public disclosure except as may be legally required, relating to this Agreement or the other party or any of its affiliates, without obtaining the prior written consent of the other party.").

62. That all changed on June 17, 2025. In a poetic turn of events, a billing dispute between the Lochen Defendants and the Tribe finally peeled back the curtain on the entire Minto Money operation, including the identity and role of the non-tribal actors pulling the strings.

63. In essence, and as described further below, while BEDCO (i.e., the Tribe) acts as the "face" of the scheme, the Non-Tribal Defendants and other outsiders control Minto Money by playing the following roles:

- The Lochen Defendants make all management decisions regarding Minto Money;

- Mecca Capital is the primary funder of Minto Money loans, and, together with other lenders, receives the majority of the profits generated therefrom;

- Next Level Servicing services Minto Money loans;

- CreditServe otherwise manages the loan process, from acquisition to collections; and

*James v. Lochen, et al.*, No.

- Thin Elk gives the operation the appearance of tribal authority and approval by issuing Minto Money's "certificate of licensure" on behalf of the "Commission."

**C. The Non-Tribal Defendants: Who They Are and Their Role in the Scheme**

### i. The Lochen Defendants

#### a. Who the Lochen Defendants Are

64. Lochen is an attorney, and the Managing Partner of Lochen Law Offices, PLLC, "a boutique law practice solely devoted to legal representation of tribes and tribal entities."[26]

65. He has presented at the Tribal Lending Conference of the Online Lenders Association, a lobbyist for high-interest lenders and their monied interests.

66. Lochen has also represented tribes facing allegations of being involved in illegal tribal lending schemes.

67. Mineral Point is Lochen's LLC. Lochen has also been affiliated with Lochen LLP and Lochen Law Offices, PLLC.

#### b. The Lochen Defendants' Role in the Scheme

68. In essence, Lochen is the manager of the entire Minto Money enterprise (as well as the Birch Lending enterprise).

69. Per the Agreement, "BEDCO "***explicitly authorizes*** and approves [the Lochen Defendants] to undertake ***all management decisions*** on behalf of [Minto Money]." *Id.* § 1(e) (emphasis added).

---

[26] LinkedIn, *Eric Lochen*, https://www.linkedin.com/in/eric-lochen-49372926/ (last visited June 27, 2025).

*James v. Lochen, et al.*, No.

70. The Agreement further details the Lochen Defendants' specific "duties," which include, *inter alia*:

- "[r]eview[ing] and consult[ing] on management of all operations performed to date by [BEDCO], with particular regard to, though not limited to, managing its consumer lending operations...";

- "assist[ing] in the engagement of third-party legal counsel for [BEDCO], including the management of such engagement and [] interface[ing] with said legal counsel on all relevant matters, inclusive of any litigation…"; and

- "oversee[ing] and provid[ing] consulting services, including management and supervisory services, to [BEDCO] staff, for purposes of managing workflow and training employees in various aspects of [BEDCO] business."

*Id.* at Appendix A, § 2.

71. The Lochen Defendants allege that they "ha[ve] helped grow BEDCO's consumer lending business into a highly successful and profitable online lending business." Lochen Complaint ¶ 20.

72. Not only do the Lochen Defendants manage the day-to-day operations of Minto Money, but the Agreement also indicates that the Lochen Defendants played a pivotal role in *funding* the scheme. That is, they introduced BEDCO to outside lenders— including Mecca Capital—to fund Minto Money loans. For example, the Agreement is effective "for the longer of either a period of **five (5) years**, or so long as [BEDCO] has

17

*James v. Lochen, et al.*, No.

any outstanding loan balance or outstanding balance on any line of credit with any lender or any affiliate thereof introduced to [BEDCO] by [the Lochen Defendants]—including without limitation Mecca Capital, Inc.—unless or until terminated in accordance with the terms of this Agreement." Agreement § 2 (emphasis in original).

73. For their "services," the Lochen Defendants are:

paid a monthly fee equal to three quarters of one percent (0.075%) of the then current monthly net revenue—defined as monthly gross revenue minus bad debt—of Minto Financial and Tolovana Financial and any other newly charted [BEDCO] subsidiaries formed for the purposes of lending and serviced by Next Level Servicing, Inc., during every month of the Term of This Agreement, to be paid from the monthly Equity Success Fee generated by [BEDCO]'s business serviced by Next Level Servicing, Inc., as it is defined in certain respective Services Agreements by and between Minto Financial and Never Level Servicing, Inc., and Tolovana Financial and Never Level Servicing, Inc.

*Id.* § 3.

74. According to the Lochen Complaint, this monthly fee is significant: $90,549.57 for the month of April 2025, and $101,913.12 for the month of May 2025. Lochen Complaint at Exhibits C-D.

75. These figures indicate that: (1) the monthly net revenue of Minto Money and Birch Lending was over $12 million in April 2025, and $13.5 million in May 2025, suggesting that these lending operations net revenue well over **$100 million** each year; and (2) the Lochen Defendants are paid over **$1 million** each year for their role in the scheme.

76. In addition to having the authority "to undertake all management decisions on behalf of [Minto Money]," and being paid handsomely for their services, the Lochen

*James v. Lochen, et al.*, No.

Defendants have made it exceedingly difficult (and expensive) for the Tribe to remove them—or their hand-picked partners—from the operation.

77. Specifically, if BEDCO terminates the Agreement for any reason, other than a breach by the Lochen Defendants:

> [The Lochen Defendants] shall be paid for all Services which [they] performed prior to such termination, including any Services performed during the notice period, and a Termination Fee equal to the sum of .5% (one half of one percent) of the monthly net revenue—defined as monthly gross revenue minus bad debt—of any subsidiary entity of [BEDCO]…and any other newly chartered [BEDCO] subsidiaries formed for the purposes of lending and serviced by Next Level Servicing, Inc., each month that an outstanding balance remains on any loan or line of credit between Company and any lender introduced to [BEDCO] by [the Lochen Defendants], including without limitation Mecca Capital, Inc.,…for every month that [BEDCO] owes any loan balance to any such lender.

Agreement § 2.

78. Not only must BEDCO continue to pay the Lochen Defendants a hefty fee so long as it owes money to any of the lenders to which the Lochen Defendants introduced the Tribe, but BEDCO cannot terminate Next Level Servicing or CreditServe without breaching the Agreement:

> During the Term of this Agreement, or any extension thereof, both Parties agree that as long as [BEDCO] has any lending agreement or arrangement with any lender introduced to [BEDCO] by [the Lochen Defendants] or any affiliate thereof, including without limitation Mecca Capital, Inc., that the Parties shall maintain this exclusive relationship and Agreement and their exclusive cross-relationships and agreements with Next Level Servicing, Inc., and CreditServe, Inc., as they relate to any portfolio of [BEDCO] benefiting from any lender [the Lochen Defendants] introduces to [BEDCO], including without limitation Mecca Capital, Inc. Any termination by [BEDCO] of any party named in this paragraph shall be deemed to be a breach of this Agreement by [BEDCO] and shall entitle [the Lochen Defendants] to the Termination Fee as set forth herein.

*Id.*

*James v. Lochen, et al.*, No.

### ii. Mecca Capital

#### a. What Mecca Capital Is

79.     Discovery will show that Mecca Capital is a private equity firm.

#### b. Mecca Capital's Role in the Scheme

80.     Mecca Capital is the primary funder of the Minto Money lending operation (as well as the Birch Lending operation).

81.     Discovery will also show that Mecca Capital, and other lenders to which the Lochen Defendants introduced BEDCO, are the primary beneficiaries of the lending scheme.

82.     As discussed above, Minto Money and Birch Lending generate net revenues of more than $10 million each month and well over $100 million each year. Discovery will show that only a small portion of these revenues flow to the small and impoverished Tribe, with the vast majority instead flowing to lenders like Mecca Capital.

### iii. Next Level Servicing

#### a. What Next Level Servicing Is

83.     Next Level Servicing is a loan servicer.

#### b. Next Level Servicing's Role in the Scheme

84.     The Agreement names Next Level Servicing as a party with which the Lochen Defendants and BEDCO each have a "cross-relationship" and "agreement." Agreement § 2. It further identifies Next Level Servicing as one of the parties that BEDCO cannot terminate without breaching the Agreement and owing the Lochen Defendants the Termination Fee. *Id.*

*James v. Lochen, et al.*, No.

85.     As the Agreement makes explicit, Next Level Servicing services the loans for Minto Money (and Birch Lending). *See generally*, *id.*

86.     Next Level Servicing has a separate agreement with BEDCO, under which Next Level Servicing receives fees and/or a portion of Minto Money's net revenues in exchange for its services.

### iv.     The CreditServe Defendants

#### a.  Who the CreditServe Defendants Are

87.     The CreditServe Defendants are no strangers to predatory lending. Indeed, for well over a decade, Welch and McGraw have been partners in a variety of businesses aimed at profiting off of vulnerable borrowers.

88.     McGraw, a TV producer and son of "Dr. Phil," became involved in the payday lending industry over a decade ago.[27]

89.     Welch is McGraw's longtime business partner and describes himself as a "[d]ynamic and results-driven Executive with 25+ years of operations experience in the financial services and restaurant industries."[28] He is also on the board of directors of the Online Lenders Alliance.

90.     In the 2010s, Welch and McGraw briefly teamed up to offer payday loans online at CashCash.com, via a corporation called Helping Hand Financial, Inc. In 2013, filings with the State of California named McGraw as the President and Secretary of the company, which had previously been called "Cadillac Tequila, Inc." By July 2017, Welch

---

[27] ProPublica, *supra* n.3.
[28] LinkedIn, *Eric W.*, https://www.linkedin.com/in/ericgwelch/ (last visited June 24, 2025).

*James v. Loehen, et al.*, No.

had joined as the company's Director. In December 2017, both Welch and McGraw signed the company's certificate of dissolution.

91.    Welch and McGraw are also named on corporation papers for Cherry Auto Finance Inc., formed in 2021, "which offers easy financing for used cars online at cherrycars.com, appealing to subprime borrowers."[29]

92.    In addition, Welch and McGraw have consistently served at the helm of their most enduring company: CreditServe.

93.    In 2013, Welch became president of MBC Financial, Inc., which, in 2014, had its name changed to CreditServe, Inc. Also in 2014, McGraw was listed as the company's President and Secretary. According to his LinkedIn, Welch has been serving as the Chief Executive Officer of CreditServe since March 2017.[30] Filings with the State of California in both 2022 and 2025 identify Welch as the company's Chief Executive Officer, Secretary, and Chief Financial Officer.

94.    As of 2018, the CreditServe Defendants readily admitted that CreditServe was a "consumer loan servicing company" and that it "manage[s]" its customers' loans.[31] They also touted that they could "think outside the box to provide innovative, modern solutions" because they had "over 15 years in consumer short-term lending."[32]

---

[29] ProPublica, *supra* n.3.
[30] LinkedIn, *supra* n.28.
[31] CreditServe (digital archive from Wayback Machine, dated Nov. 23, 2018), https://web.archive.org/web/20181123150413/https:/crserve.com/ (last visited June 24, 2025).
[32] *Id.*

22

Case 4:25-cv-00024-SLG    Document 1    Filed 07/03/25    Page 22 of 42
*James v. Loehen, et al.*, No.

95.     However, this language has since been scrubbed from the CreditServe website. The CreditServe Defendants now simply claim that CreditServe is a "management consulting company" and that they are "able to think outside of the box and provide solutions that will last have" because they have "extensive knowledge in a variety of subjects."[33]

96.     Despite the changes that the CreditServe Defendants might have made to the CreditServe website, the nature of their work remains unchanged. As the LinkedIn profiles of numerous CreditServe employees (including Welch himself) illustrate, the CreditServe Defendants manage their customers' loans, from acquisition to collections.

97.     **Lead Acquisition.** One current CreditServe employee, the "Chief Credit Officer," touts that he "[l]ead[s] and grow[s] a department focused on Credit Risk Management, Model Development, Underwriting Strategy, Lead Acquisition, Portfolio Management, Fraud Management, and Analytics," and, in a previous role with the company, "[m]anaged a team of data scientists and analysts focused on forecasting, custom score development, and portfolio analysis."[34]

98.     **Loan Underwriting, Approval, and Origination.** Welch himself boasts that CreditServe provides "best in class underwriting & decisioning" to its FinTech customers.[35] Another current CreditServe employee, a "Communications Supervisor," states that, among other things, she: "[h]andle[s] administrative tasks throughout the day,

---

[33] CreditServe, https://crserve.com/ (last visited June 24, 2025).
[34] LinkedIn, *Jeremy Jones*, https://www.linkedin.com/in/jerdonjones/ (last visited June 24, 2025).
[35] LinkedIn, *supra* n.28.

*James v. Loehen, et al.*, No.

including originating loans and completing supervisor-level processes submitted by agents via email" and "[r]eview[s] loans for accuracy before originating and verify details for revoke requests to maintain precision."[36] In addition, a "Call Center Supervisor/Trainer" who left the company in November 2022 states that his job responsibilities included "finaliz[ing] loans for customers" and "[r]eveiw[ing] and [a]pprov[ing] [l]oans based on customer qualifications."[37] And a former "Data Scientist" who left CreditServe in April 2024, among other things, was "[r]esponsible for the design, buildout, automation, and maintenance of…[a]pplicant conversion and profitability scoring."[38]

99. **Collections.** Another current CreditServe employee lists her title as a "Debt Collector Specialist."[39] And a "Collections Specialist" who worked at the company until July 2024 reveals that, during his employment, he was one of 14 individuals working in collections.[40]

100. **Customer Support.** The aforementioned Communications Supervisor admits that she "[s]upervise[s] a team of customer service representatives handling live chat support, customer service emails, and SMS communications across six loan portfolios."[41] In addition, CreditServe was recently accepting applications for a "Customer

---

[36] LinkedIn, *Monica Mendiola*, https://www.linkedin.com/in/monicamendiola/ (last visited June 24, 2025).
[37] LinkedIn, *Warren J.*, https://www.linkedin.com/in/warren-j-72a1a8b0/ (last visited June 24, 2025).
[38] LinkedIn, *Adam D. Cazes*, https://www.linkedin.com/in/adamcazes/ (last visited June 24, 2025).
[39] LinkedIn, *Isabel V.*, https://www.linkedin.com/in/vegalisa/ (last visited June 24, 2025).
[40] LinkedIn, *Daniel Carr*, https://www.linkedin.com/in/daniel-carr-6642a3104/ (last visited June 24, 2025).
[41] LinkedIn, *supra* n.36.

*James v. Loehen, et al.*, No.

Service Representative," who "will play a crucial role in authenticating information provided for the purposes of funding consumer, short-term personal loans."

101. **Operational Support.** Lastly, Welch describes CreditServe as providing "day-to-day operational support," as well as marketing and compliance services, to its clients.[42]

### b. The CreditServe Defendants Role in the Scheme

102. The Agreement names CreditServe as a party with which the Lochen Defendants and BEDCO each have a "cross-relationship" and "agreement." Agreement § 2. It further identifies CreditServe as one of the parties that BEDCO cannot terminate without breaching the Agreement and owing the Lochen Defendants the Termination Fee. *Id.*

103. The CreditServe Defendants provide lead acquisition, loan underwriting, approval, and origination, collections, customer support, and/or other operational support to Minto Money (as well as Birch Lending).

104. Indeed, in May 2025, when Plaintiff contacted the Minto Money "Customer Care Team" via email, she received responses from Minto Money representatives named Donnie and Juanita. *See* Ex. 4. But there is no one with these names on staff at BEDCO.

---

[42] LinkedIn, *supra* n.28.

*James v. Lochen, et al.*, No.

On the other hand, CreditServe—which has only approximately 100 employees—*does* have employees named both Juanita[43] and Donnie.[44]

105.     The CreditServe Defendants have a separate agreement with BEDCO, under which the CreditServe Defendants receive fees and/or a portion of Minto Money's net revenues in exchange for their services.

### v.     Thin Elk

#### a.  Who Thin Elk Is

106.     Thin Elk is an attorney who formerly practiced with Lochen at Lochen Law Offices, PLLC.

#### b.  Thin Elk's Role in the Scheme

107.     Thin Elk is the sole "Commissioner" of the Minto Financial Services Licensing & Regulatory Commission, the purported entity that issued Minto Money's "certificate of licensure," which is prominently displayed on the lending operation's website.

108.     Accordingly, Thin Elk provides Minto Money with its tribal disguise: by serving as the Commissioner and signing his name on the Minto Money "license," he lends credence to the notion that the Tribe controls Minto Money when, in reality, it does no such thing.

---

[43] LinkedIn, *Juanita George-Huguley*, https://www.linkedin.com/in/juanita-george-huguley-0b3953148/ (last visited June 24, 2025).
[44] LinkedIn, *Donnie Rogers*, https://www.linkedin.com/in/donnie-rogers-791b2915b/ (last visited June 24, 2025).

*James v. Lochen, et al.*, No.

**D.** **The Non-Tribal Defendants Exercise Significant Control over the Operations of Minto Money**

109.    The Tribe does not meaningfully participate in the day-to-day lending operations of Minto Money. Rather, the Non-Tribal Defendants, and other non-tribal schemers to be uncovered in discovery, exercise control of the illegal lending enterprise by operating all substantive aspects of the business, including the strategy, funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections of the illegal loans.

110.    The majority of the profits made by Minto Money did not and do not flow to the Tribe. Instead, discovery will show that the vast majority of the profits flow to non-tribal outsiders, including Mecca Capital and other lenders introduced to BEDCO by the Lochen Defendants. In addition, the Lochen Defendants, the CreditServe Defendants, and Next Level Servicing receive millions of dollars in exchange for their "services" to the operation.

111.    Minto Money is not licensed to lend in the states in which it is lending, and it is lending at interest rates that are illegal in many states. The only license that Minto Money purports to have is the one, signed by Thin Elk, that was issued by the Tribe's purported "Commission."[45]

112.    Under the terms of Minto Money's loan agreements, Defendants lent borrowers small sums of money and charged annual interest rates in the high triple digits—

---

[45] Minto Money, *About Minto Money*, https://mintomoney.com/about/ (last visited June 27, 2025).

*James v. Lochen, et al.*, No.

rates often exceeding 700%. As a result of these exorbitant finance charges, Plaintiff and others have ended up owing, and paying, many times the amount of money that they initially borrowed.

113.    The interest rates that Defendants charged under these loan agreements are many times the caps imposed by state law in a number of jurisdictions, including the state in which Plaintiff resides.

**E.    Plaintiff's Loan with Minto Money**

114.    From her residence in Stevinson, California, Plaintiff applied for and took out a loan with Minto Money over the internet in October 2023. At the time she took out the loan, Plaintiff believed that Minto Money was operating lawfully and lending at rates that complied with the law.

115.    Plaintiff's loan from Minto Money was for $600 and had an interest rate of 755.29%. According to the loan agreement, the finance charges on the loan were $4,924.55. Except for the final payment, the monthly payment on the loan was $345.24. If Plaintiff had made all of the payments on her loan according to the payment schedule, she would have ended up paying Defendants $5,524.55 for her $600 loan—more than nine times what she borrowed. Plaintiff paid $4,833.36 for this loan—more than **eight times** the $600 that she borrowed—before she ceased making payments once she learned that her loan from Minto Money is usurious.

116.    The State of California sets the maximum allowable interest rate on a consumer loan at 10%. Cal. Const. Art. XV § 1.

*James v. Loehen, et al.*, No.

117. Defendants' loan to Plaintiff and those to other California residents all carried interest rates that were many times California's 10% interest rate cap.

118. California's Unfair Competition Law ("UCL") prohibits unfair or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

119. Defendants unlawfully lent money to Plaintiff and other California residents through illegal loans marred by usurious interest, and thus violated the UCL.

## CLASS ACTION ALLEGATIONS

120. Plaintiff asserts claims on behalf of the proposed National Class defined as follows:

> All United States residents who entered into loan agreements with Minto Money and/or Birch Lending within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah or Nevada.

121. Plaintiff asserts claims on behalf of the proposed California Class defined as follows:

> All California residents who entered into loan agreements with Minto Money and/or Birch Lending within the applicable statute of limitations.

**A. Numerosity**

122. There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

**B. Commonality**

123. There are numerous common questions of law and fact common to Plaintiff and the members of the Classes. These questions include, but are not limited to, the following:

*James v. Loehen, et al.*, No.

a. Whether Defendants violated state usury and consumer protection laws;

b. Whether Defendants are protected by tribal sovereign immunity;

c. Whether Defendants engaged in unfair or deceptive acts or practices;

d. Whether Defendants constitute an "enterprise" under RICO;

e. Whether Defendants violated RICO by charging interest rates more than the twice the legal limit under state law;

f. The scope of any prospective relief; and

g. The proper measure and amount of damages for the Classes.

## C. Typicality

124. Plaintiff's claims are typical of the claims of the Classes she seeks to represent. Plaintiff, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiff's claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

## D. Adequacy

125. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating tribal lending cases. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor her counsel have interests that conflict with those of the Classes.

## E. Injunctive Relief

126. The Classes meet the requirements for certification to obtain injunctive or

*James v. Loehen, et al.*, No.

equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

## F. Predominance and Superiority

127. The Classes meet the requirements for certification to seek monetary relief under Federal Rule of Civil Procedure 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy for at least the following reasons:

   a.   Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

   b.   It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

   c.   A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

31

*James v. Loehen, et al.*, No.

d. The lawsuit presents no difficulties that would impede its management by the Court as a class action.

e. Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Non-Tribal Defendants)**

128. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

129. Each Non-Tribal Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

130. The Enterprise, consisting of each of the named Non-Tribal Defendants, and the unnamed officers, executives, and other employees of the Non-Tribal Defendants and other companies involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

131. The Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

132. The Non-Tribal Defendants violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful

*James v. Loehen, et al.*, No.

debt.

133.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

134.    All of the loans made to the National Class members and collected by the Non-Tribal Defendants included an interest rate far in excess of twice the enforceable rate in National Class members' respective states.

135.    The Non-Tribal Defendants charged Plaintiff interest rates in excess of the maximum rate allowed in her state knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiff.

136.    The Non-Tribal Defendants' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent laws in Plaintiff's state, and to collect interest at rates more than twice that allowed under that state's laws.

137.    Plaintiff and the National Class members were injured as a result of the Non-Tribal Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

138.    This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

33

*James v. Loehen, et al.*, No.

139.    Accordingly, the Non-Tribal Defendants are jointly and severally liable to Plaintiff and National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## SECOND CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Non-Tribal Defendants)**

140.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

141.    Each Non-Tribal Defendant is a "person" as that term is defined in 18 U.S.C. § 1964(3).

142.    The Enterprise, consisting of each of the named Non-Tribal Defendants, and the unnamed officers, executives, and other employees of the Non-Tribal Defendants and other companies involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with the Non-Tribal Defendants.

143.    The Enterprise had an ongoing organization with an ascertainable structure and functioned as a continuing unit with separate roles and responsibilities.

144.    The Non-Tribal Defendants violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Non-Tribal Defendants knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and

*James v. Loehen, et al.*, No.

collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

145.    This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

146.    Accordingly, the Non-Tribal Defendants are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## THIRD CAUSE OF ACTION
**Violations of California's Usury Law**
**(On Behalf of Plaintiff and the California Class)**
**(Class Claims against the Non-Tribal Defendants)**

147.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

148.    Under the California Constitution, the maximum allowable interest rate on a consumer loan is 10% per annum. Cal. Const. Art. XV § 1.

149.    As alleged above, the loans taken out by Plaintiff and California Class members were usurious and each carried an annual interest rate well in excess of 10%.

150.    Accordingly, Plaintiff and members of the California Class are entitled to recover all interest paid on the loans in excess of 10%, plus treble damages for any interest paid within the year preceding the filing of this action and their attorneys' fees and costs. Cal. Civ. Code § 1916-3.

## FOURTH CAUSE OF ACTION
**Violations of Cal. Bus. & Prof. Code § 17200**
**(On Behalf of Plaintiff and the California Class)**
**(Class Claims against the Non-Tribal Defendants)**

*James v. Loehen, et al.*, No.

151.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

152.    As alleged above, the Non-Tribal Defendants engaged in unlawful, fraudulent, and/or unfair business practices through the sham relationship with the Tribe in order to make high-interest loans to consumers throughout the country, including in California. The Non-Tribal Defendants' unlawful, fraudulent, and/or unfair acts include the following:

a.    Attempting to avoid application of California usury law by improperly using tribal sovereign immunity as a shield for their activities;

b.    Representing or implying that state law does not apply to Plaintiff's and California Class members' loans;

c.    Charging interest rates that are well in excess of the rates allowed by law and demanding or collecting payment of this excessive interest.

153.    The Non-Tribal Defendants' unlawful, fraudulent, and/or unfair acts and practices have occurred in trade or commerce.

154.    The Non-Tribal Defendants' acts and practices are unfair because they: (i) cause substantial financial injury to Plaintiff and members of the California Class; (ii) are not outweighed by any countervailing benefits to consumers or competitors; and (iii) are not reasonably avoidable by consumers. The Non-Tribal Defendants' acts and practices are also unfair because they are immoral, unethical, oppressive and unscrupulous.

155.    The Non-Tribal Defendants' unfair acts or practices have impacted the public interest because they have injured Plaintiff and thousands of California residents by

*James v. Loehen, et al.*, No.

charging them interest in excess of the amount allowed by law. The Non-Tribal Defendants acted unfairly by representing or implying that they could legally charge interest rates of 700% or more because the Non-Tribal Defendants claim that Minto Money is a tribal entity not subject to state law.

156.    As a direct and proximate result of the Non-Tribal Defendants' unlawful, fraudulent, and/or unfair acts and practices, Plaintiff and the California Class have been injured in their money or property. By charging and collecting interest that they were not legally entitled to charge or collect, the Non-Tribal Defendants have injured the property of Plaintiff and the other members of the California Class.

157.    The Non-Tribal Defendants' wrongdoing is continuing in nature and represents an ongoing threat to Plaintiff and California Class members, particularly since the Non-Tribal Defendants continue to represent that they are lawfully entitled to make loans exceeding California's usury cap, continue to make loans to California residents at usurious interest rates, and continue to collect unlawful interest on usurious loans already made to California residents. Thus, Plaintiff and California Class members will suffer continuing, immediate, and irreparable injury absent the issuance of injunctive and equitable relief.

158.    Accordingly, Plaintiff and California Class members are entitled to recover all interest paid on the loans in excess of 10%, as well as to obtain an injunction prohibiting any future collection of the loans. Cal. Bus. & Prof. Code § 17203.

### FIFTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the National Class)**

*James v. Loehen, et al.*, No.

<b>(Class Claims against the Non-Tribal Defendants)</b><br><b>(Alleged in the Alternative)</b>

159. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

160. To the detriment of Plaintiff and National Class members, the Non-Tribal Defendants have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates.

161. As between the parties, it would be unjust for the Non-Tribal Defendants to retain the benefits attained by their actions. Accordingly, Plaintiff seeks a full accounting and restitution of the Non-Tribal Defendants' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

<b><u>SIXTH CAUSE OF ACTION</u></b><br><b>Civil Conspiracy</b><br><b>(On Behalf of Plaintiff and the National Class)</b><br><b>(Class Claims against the Non-Tribal Defendants)</b>

162. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

163. All of the loans that the Non-Tribal Defendants made to consumers in the name of Minto Money violated Plaintiff's and the National Class members' respective states' interest rates and lending laws.

164. The Non-Tribal Defendants conspired amongst themselves and with other actors to violate state usury and lending laws and profit from those violations.

165. Accordingly, on behalf of herself and the members of the National Class, Plaintiff seeks to recover from the Non-Tribal Defendants, jointly and severally, all

38

<i>James v. Loehen, et al.</i>, No.

amounts repaid on any loans with the Non-Tribal Defendants.

## SEVENTH CAUSE OF ACTION
### Declaratory Judgment, 28 U.S.C. § 2201
### (On Behalf of Plaintiff and the California Class)
### (Class Claims against Tribal Defendants in their official capacities)

166.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

167.    California—along with many other states—requires that those who engage in the business of making small loans be licensed.

168.    Defendants were not licensed to make loans in California or any other state.

169.    Because Defendants' loans were made without the required license and/or charged excessive interest rates, those loans are void in California.

170.    In addition to violating state licensing laws, Defendants' loans also violated the general usury laws of many states, including California.

171.    Further, the lending agreements used for Plaintiff's and California Class members' loans contained unconscionable choice-of-law and forum-selection provisions that are void and unenforceable.

172.    Because of the triple-digit interest rates, Plaintiff and certain California Class members with unpaid balances are subject to significant liability as the interest accrues on their unpaid debts.

173.    Resolution of the validity and enforceability of the outstanding balance on Plaintiff's loan agreement by this Court will determine the rights and interests of the parties to their respective agreements.

*James v. Loehen, et al.*, No.

174.     Thus, the validity and enforceability of Plaintiff's loan agreement, including, but not limited to, any outstanding balance, presents a substantial, non-speculative controversy between parties with adverse legal interests of sufficient immediacy and reality.

175.     Accordingly, Plaintiff, on behalf of herself and the members of the California Class, seeks a determination that her loan and those of the California Class members are void and unenforceable, and that Plaintiff and the California Class members are not obligated to pay any principal and/or interest outstanding on the illegal loans under their respective state laws.

## EIGHTH CAUSE OF ACTION
### Injunctive Relief for Violations of State Law
### (On Behalf of Plaintiff and the California Class)
### (Class Claims against the Tribal Defendants in their official capacities for prospective relief)

176.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

177.     As alleged herein, Plaintiff and other consumers in California applied for and took out loans with Minto Money, which the consumers maintain are void and unenforceable because the loans violate state laws.

178.     Plaintiff and members of the California Class have outstanding balances on their loans with Minto Money.

179.     Because of the usurious interest rates charged by Minto Money, Plaintiff and other consumers in California are subject to significant liability as the interest accrues on their unpaid debts.

*James v. Lochen, et al.*, No.

180.    Accordingly, Plaintiff, on behalf of herself and the California Class, seeks injunctive relief from the Tribal Defendants, including, but not limited to, an order: (i) prohibiting the Tribal Defendants from continuing to make or collect on the illegal loans in California; (ii) requiring the Tribal Defendants to send notices to California consumers explaining that their loans are illegal and usurious; and (iii) prohibiting the Tribal Defendants from selling the unlawful loans to consumers in California to third-party debt collectors.

181.    Plaintiff, on behalf of herself and all others similarly situated, further seeks a determination that she and the California Class members are not obligated to pay any principal and/or interest outstanding on the illegal loans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

A.      An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B.      An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.      An Order declaring that Defendants have committed the violations of law alleged herein;

D.      An Order providing for any and all injunctive relief the Court deems appropriate;

E.      An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the

*James v. Lochen, et al.*, No.

Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount consistent with applicable precedent;

G.     An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H.     An Order awarding Plaintiff her reasonable costs and expenses of suit, including attorneys' fees; and

I.     Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated: July 3, 2025                    Respectfully submitted,

John G. Albanese
BERGER MONTAGUE PC
Attorneys for Plaintiff

By: /s/ John G. Albanese

John G. Albanese, *pro hac vice forthcoming*

*James v. Lochen, et al.*, No.