**EXHIBIT 1**

Mineral Point Consulting LLC,

        Plaintiff,

v.

Benhti Economic Development Corporation,

        Defendant.

Case No. _2:25-cv-868_____

**COMPLAINT**

For its Complaint against Defendant Benhti Economic Development Corporation ("BEDCO"), Plaintiff Mineral Point Consulting LLC ("Mineral Point") states and alleges:

<u>**PARTIES**</u>

1.      Mineral Point is a limited liability company formed in the State of Wyoming with a principal place of business located at 6801 Jefferson Street NE, Suite 150 PMB 3150, Albuquerque, New Mexico. Mineral Point has a single member, who is an individual domiciled in Wisconsin. Mineral Point is thus a citizen of Wisconsin for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a).

2.      BEDCO is a corporation chartered under Tribal law by the Native Village of Minto ("the Tribe"), a federally recognized Indian tribe located in Minto, Alaska. BEDCO's principal place of business is located at 100 Cushman Street, Suite 306, Fairbanks, Alaska. BEDCO is a citizen of Alaska for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a). *See Wells Fargo Bank, Nat. Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 693 (7th Cir. 2011) ("[A] corporation chartered under Native

American tribal law should be treated as a citizen of a state pursuant to § 1332(c).").
BEDCO's chartered subsidiaries include Minto Financial and Tolovana Financial.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4. This Court has personal jurisdiction over BEDCO because this dispute is covered by contracts and agreements providing for exclusive jurisdiction in Wisconsin, and BEDCO has therefore consented to submit to personal jurisdiction in Wisconsin.

5. Venue is proper in this Court because this dispute is covered by contracts and agreements providing for exclusive jurisdiction and venue in Wisconsin for all disputes arising out of such agreements. Venue is also proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this district, as the services performed under the parties' contracts and agreements were performed in Wisconsin.

6. All requirements and conditions precedent to bringing this action have been satisfied, performed, or waived.

## FACTUAL ALLEGATIONS

### The Agreement

7. On December 3, 2022, BEDCO and Mineral Point executed the Executive Management Consultant Engagement and Services Agreement ("the Agreement"). A copy of the Agreement is attached as **Exhibit A**.

8.      The Agreement was reviewed, authorized, and executed by BEDCO under Resolution No. 2022-18 of its Board of Directors. A copy of Resolution No. 2022-18 to Approve Executive Management Consultant Engagement and Management Services Agreement is attached as **Exhibit B**.

9.      Under the Agreement, Mineral Point provided certain consulting services (the "Services") to BEDCO with respect to BEDCO and its subsidiaries' consumer lending operations. The scope of Services provided are described in Appendix A, which was attached to and incorporated into the Agreement. (Ex. A at 1, 13-14.)

10.      The parties agreed that the Agreement would remain in effect for the longer of (1) five years, or (2) any period during which BEDCO or its subsidiaries maintained a balance on any loan or line of credit issued by it by a lender introduced to BEDCO by Mineral Point, unless the Agreement was terminated in accordance with the Agreement's terms. (*Id.* at 2.)

11.      The Agreement permits either party to terminate the Agreement for any reason upon 90 days' written notice in the event of termination by BEDCO or 30 days' written notice in the event of termination by Mineral Point. (*Id.*)

12.      As compensation for Mineral Point's consulting services, BEDCO agreed to pay Mineral Point a monthly fee for services ("the Services Fee") equal to three quarters of one percent (.075%) of monthly net revenue derived from the consumer lending operations conducted by BEDCO's wholly owned subsidiaries. (*Id.* at 3, 14.)

13.      Under the Agreement, the Services Fee is calculated as of the close of business each month during the term of the Agreement. (*Id.* at 14.)

14.     To enable the parties to calculate the Services Fee, the Agreement requires BEDCO to provide Mineral Point with monthly verification and access to financial reports. (*Id.*)

15.     The Services Fee is due and payable to Mineral Point on the 15th day following the close of every month during the term of the Agreement. (*Id.*)

16.     In the event that BEDCO withholds any payments from Mineral Point due to a dispute regarding the Services, BEDCO is required to provide Mineral Point with a detailed written notice setting forth the reason for refusing to pay and afford Mineral Point a reasonable opportunity to correct the disputed work. (*Id.* at 3.)

17.     If any amount owed to Mineral Point remains delinquent for 30 days after the due date and BEDCO has not disputed the invoice, then any such amount incurs interest at a rate of 1.5% per month. (*Id.*) Mineral Point has the right to pause all work until all late payments are made. (*Id.*) If Mineral Point pauses work, Mineral Point remains entitled to payment under the Agreement while work is paused. (*Id.*)

18.     The Agreement also provides that in the event of a termination by either party, BEDCO must pay Mineral Point for (1) all services rendered by Mineral Point during the term of the Agreement, including any Services provided by Mineral Point during the contractually required termination notice period, and (2) a termination fee equal to the sum of one half of one percent (.5%) of the monthly net revenue of BEDCO's consumer lending subsidiaries for every month that BEDCO maintained a balance on any loan or line of credit issued by any lender introduced to BEDCO by Mineral Point ("the Termination Fee"). (*Id.* at 2.)

19.     Since the Agreement was executed, Mineral Point has continuously provided services to BEDCO and its subsidiaries. Until May 2025, BEDCO timely paid Mineral Point's invoices on a monthly basis.

20.     Mineral Point has helped grow BEDCO's consumer lending business into a highly successful and profitable online lending business.

**BEDCO Breaches the Agreement**

21.     On May 9, 2025, consistent with the parties' past practices under the Agreement, Mineral Point provided an invoice to BEDCO for services rendered during the April 2025 billing period. The invoice requested payment in the amount of $90,549.57. A copy of the invoice is attached as **Exhibit C**.

22.     BEDCO did not pay amounts due for services rendered in April 2025 by May 15, 2025, as required by the Agreement.

23.     On May 16, 2025, Mineral Point sent an email to BEDCO requesting that it promptly issue payment as required by the Agreement.

24.     BEDCO did not issue the requested payment.

25.     BEDCO did not provide written notice of any dispute as to the fees reflected in the April 2025 invoice or the services rendered by Mineral Point. BEDCO has not provided any notice of a dispute regarding the Services.

26.     To date, BEDCO has not made any payment for services rendered in April 2025.

27.     On June 11, 2025, Mineral Point provided an invoice to BEDCO for services rendered during the May 2025 billing period. The invoice requested payment in the amount of $101,913.12. A copy of the invoice is attached as **Exhibit D**.

28.     BEDCO did not pay amounts due for services rendered in May 2025 by June 15, 2025, as required by the Agreement.

29.     BEDCO has not provided notice that it disputes the fee amount or services provided. It continues to benefit from the services Mineral Point provided but refuses to pay for those services.

<u>COUNT ONE</u>
**Breach of Contract**

30.     Mineral Point realleges paragraphs 1 through 29 of this complaint.

31.     The Agreement is a valid contract creating obligations between BEDCO and Mineral Point.

32.     The Agreement required BEDCO to pay the Services Fee for April 2025 to Mineral Point by May 15, 2025.

33.     BEDCO failed to pay the Services Fee by May 15, 2025. To date, BEDCO has not paid the Services Fee for April 2025.

34.     The Agreement required BEDCO to pay the Services Fee for May 2025 to Mineral Point by June 15, 2025.

35.     BEDCO failed to pay the Services Fee by June 15, 2025. To date, BEDCO has not paid the Services Fee for May 2025.

36.     BEDCO breached the Agreement and continues to breach the Agreement by failing to pay Services Fees owed under the Agreement.

37.     As a result of BEDCO's breach of the Agreement, Mineral Point has suffered damages in an amount to be determined at trial.

## COUNT TWO
### Unjust Enrichment

38.     Mineral Point realleges paragraphs 1 through 29 of this complaint.

39.     Mineral Point conferred a benefit on BEDCO by rendering the Services to BEDCO.

40.     BEDCO voluntarily and knowingly accepted and retained the benefit conferred on it by Mineral Point.

41.     In these circumstances, it is inequitable for BEDCO to accept and retain the benefit of the Services without paying for the Services.

**WHEREFORE**, Mineral Point requests the following relief:

1.      Judgment in favor of Mineral Point and against BEDCO on the claims set forth above;

2.      Awarding Mineral Point damages against BEDCO based on the claims set forth above, including but not limited to any and all unpaid Services Fees and interest on any late-paid amounts, in an amount exceeding $75,000 to be proven at trial;

3.      Awarding Mineral Point its costs, disbursements, and attorneys' fees incurred in this matter;

4.      Such other and further relief as the Court deems just and equitable.

7

Dated:  June 17, 2025

/s/  Mark Vyvyan

Mark W. Vyvyan (#1024299)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street
Suite 1500
Minneapolis, MN  55402-4400
(612) 492-7000
mvyvyan@fredlaw.com

***Attorney for Plaintiff***

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Place an "X" in the appropriate box (required): ☐ Green Bay Division ☒ Milwaukee Division

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Mineral Point Consulting LLC | Benhti Economic Development Corporation |

| (b) County of Residence of First Listed Plaintiff _____ *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant _____ *(IN U.S. PLAINTIFF CASES ONLY)* NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |
|---|---|

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* Mark W. Vyvyan (#1024299), FREDRIKSON & BYRON, P.A. 60 South Sixth St, Suite 1500, Minneapolis MN 55402 612-492-7005 | Attorneys *(If Known)* Michelle Fox, Cedar Tree Native Law, PO Box 1379, Rapid City, South Dakota, 57709, 406-788-4258 - has represented BEDCO in the past but unclear if representing BEDCO in this action. |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability | ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal | **LABOR** ☐ 710 Fair Labor Standards Act | | (15 USC 1681 or 1692) ☐ 485 Telephone Consumer Protection Act |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | Property Damage ☐ 385 Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV ☐ 850 Securities/Commodities/ |
| ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice | Product Liability | ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | Exchange ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters ☐ 895 Freedom of Information |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | **FEDERAL TAX SUITS** | Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | Employment ☐ 446 Amer. w/Disabilities - Other ☐ 448 Education | **Other:** ☐ 540 Mandamus & Other ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | State Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
N/A - breach of contract, federal diversity under 28 USC 1332(a)

Brief description of cause:
This is a breach of contract action involving amounts due but unpaid under an agreement between the parties.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Damages in amount over $75,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See updated instructions)*:
JUDGE _____ DOCKET NUMBER _____

DATE 06/17/2025

SIGNATURE OF ATTORNEY OF RECORD /s/ Mark Vyvyan

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

# EXHIBIT A

# EXECUTIVE MANAGEMENT CONSULTANT ENGAGEMENT AND SERVICES AGREEMENT

This Executive Management Consultant Engagement and Services Agreement (the "Agreement") dated December 1, 2022 ("Effective Date"), by and between Benhti Economic Development Corporation (the "Company"), a wholly owned and operated Tribal economic arm and entity formed under the laws of the Native Village of Minto ("Tribe"), a federally recognized Indian tribe, including Company's chartered subsidiaries (including, without limitation, Minto Financial and Tolovana Financial) and having their principal office address at100 Cushman Street, Suite 306, Fairbanks, AK 99710, and Mineral Point Consulting LLC (the "Consultant"), a limited liability company formed under the laws of the State of Wyoming and having their principal office address at 320 Gold Ave. SW, Suite 620 PMB 1875, Albuquerque, NM 87102.

WHEREAS, the Consultant wishes to provide the services as set forth in **Appendix A** (the "Services"), which is attached hereto and made a part hereof; and

WHEREAS, the Company wishes to procure the Services from the Consultant, for good and valuable consideration, as fully described in Appendix A attached hereto and made a part hereof.

NOW, THEREFORE, in consideration of the mutual promises and covenants hereinafter set forth, the parties hereto agree as follows:

## 1. SCOPE OF WORK.

(a)     The Consultant agrees to provide the Services listed in Exhibit A as attached hereto.

(b)     In the event that additional services for entities of the Company are agreed upon between the Consultant and the Company, the parties shall do so in writing describing the additional assignments, including the fees and schedule for that specific assignment and/or entity ("the Additional Services").

(c)     Unless otherwise agreed by the Company, all work will be done or managed by the Consultant.

(d)     Company agrees to provide any necessary information, materials, and approvals needed by Consultant to perform the Services outlined in a timely manner.

(e)     Company explicitly authorizes and approves Consultant to undertake all management decisions on behalf of Company and Company subsidiaries consistent with Company laws and policies and Consultant pledges to provide the Company regular updates with respect to such management decisions.

## 2. TERM/TERMINATION.

1

This Agreement is effective as of the Effective Date and shall be effective for the longer of either a period of **five (5) years**, or so long as Company has any outstanding loan balance or outstanding balance on any line of credit with any lender or any affiliate thereof introduced to Company by Consultant—including without limitation Mecca Capital, Inc.—unless or until terminated in accordance with the terms of this Agreement (the "Term").

Upon the Effective Date, any prior agreement(s) between Eric Lochen, Standing High Lochen LLP, or Lochen Law Offices, PLLC, and Company, and any of its subsidiary entities, shall be terminated by Eric Lochen, Standing High Lochen LLP, and Lochen Law Offices, PLLC. The date of such termination may be extended by the parties by mutual written agreement.

The Company may, upon ninety (90) days' written notice, terminate this Agreement for any reason, subject to the terms of this Agreement.   In the event of any such termination (except in the case of Consultant's breach of this Agreement), the Consultant shall be paid for all Services which it performed prior to such termination, including any Services performed during the notice period, and a Termination Fee equal to the sum of .5% (one half of one percent) of the monthly net revenue—defined as monthly gross revenue minus bad debt—of any subsidiary entity of Company of the then current monthly net revenue—defined as monthly gross revenue minus bad debt—of Minto Financial and Tolovana Financial and any other newly chartered Company subsidiaries formed for the purposes of lending and serviced by Next Level Servicing, Inc., each month that an outstanding balance remains on any loan or line of credit between Company and any lender introduced to Company by Consultant, including without limitation Mecca Capital, Inc., and any lender introduced to Company by Consultant—including without limitation Mecca Capital, Inc.—for every month that Company owes any loan balance to any such lender.

The Consultant may, upon written notice, terminate this Agreement with thirty (30) days' notice for any reason. In the event of any such termination, the Consultant shall be paid for Services under this Agreement, including any Services performed during the notice period and the Termination Fee as set forth herein.

Within five (5) days of termination of this Agreement, the Consultant shall return to the Company the product of all Services, including all source code, data, materials and other work product, models or algorithms developed by the Consultant but in possession of the Consultant and copies thereof, in their then current condition, whether created by Consultant or supplied to Consultant in connection with this Agreement.

During the Term of this Agreement, or any extension thereof, both Parties agree that as long as Company has any lending agreement or arrangement with any lender introduced to Company by Consultant or any affiliate thereof, including without limitation Mecca Capital, Inc., that the Parties shall maintain this exclusive relationship and Agreement and their exclusive cross-relationships and agreements with Next Level Servicing, Inc., and CreditServe, Inc., as they relate to any portfolio of Company benefiting from any lender Consultant introduces to Company, including without limitation Mecca Capital, Inc.  Any termination by Company of any party named in this paragraph shall be deemed to be a breach of this Agreement by Company and shall entitle Consultant to the Termination Fee as set forth herein.

2

## 3. PAYMENT FOR SERVICES.

(a) The Company agrees to pay the Consultant in accordance with the fees and schedule as set out in **Appendix A** (the "Fees").

(b) In the event the Company withholds any payments from the Consultant due to Disputed Work, the Company shall concurrently provide the Consultant with a detailed written notice setting forth the reason(s) for such non-acceptance, and the Consultant shall have a reasonable opportunity to correct such work. Upon such correction, the withheld amounts shall be promptly paid within 5 days.

(c) The Company shall pay all amounts due monthly within five (5) days of the close of every month during the Term of this Agreement.

(d) If an amount remains delinquent 30 days after its due date and has not been disputed in accordance with this Section, it will be considered a late payment. Late payments shall incur interest at a rate of 1.5% per month, not to exceed 18% in a year. Consultant has the right to pause all work until all late payments are made. In the event that Consultant pauses work, Consultant shall still be entitled to payment under Sect. 3(a) and Appendix A for the month(s) while work is paused.

## 4. INDEPENDENT CONTRACTOR.

(a) The Consultant shall perform all the Services as an independent contractor of the Company, and nothing contained herein shall be deemed to create any association, partnership, joint venture, or relationship of principal and agent or master and servant, or employer and employee between the Company and the Consultant or any of its Affiliates, employees, or subcontractors thereof, or to provide either party with the right, power or authority, whether express or implied, to create any such duty or obligation on behalf of the other party.

(b) The Consultant also agrees not to be treated, or seek to be treated, as an employee of Company for any purpose, including for the purposes of fringe benefits provided by the Company, or for disability income, taxes and benefits. The Consultant's employees and subcontractors, if any, also shall not be deemed an employee of the Company for any reason whatsoever. The Consultant hereby represents that the Consultant has and at all times will maintain timely payments of all taxes due.

## 5. COMPLIANCE WITH LAWS.

The Consultant agrees to comply with all applicable laws, ordinances, regulations and codes in the performance of its obligations under this Agreement, including but not limited to the procurement of permits, licenses and certificates where required and payment of applicable taxes. The Consultant further agrees to hold harmless and indemnify the Company and its Affiliates against any loss or damage (including reasonable Attorney's fees) that may be sustained by reason of the failure of the Consultant to comply with such laws, ordinances, regulations and codes provided

3

that the Company cooperates, within reason, with the Consultant when conducting the defense and any related settlement.

## 6. PROPRIETARY RIGHTS.

**(A) Confidentiality**.

    **(i) Definition of Confidential Information**. The parties acknowledge that in connection with the Services, either party may have already acquired or may acquire the proprietary or confidential information of the other party, including trade secrets and all other discoveries, inventions, developments, website designs, other designs, improvements, formulas, software programs, code, algorithms, processes, techniques, know-how, data, databases, data input and retrieval processes, research, techniques, technical data, customer and supplier lists, payment systems, email campaigns, website traffic, and any modifications or enhancements of any of the foregoing, program, pricing, marketing (including but not limited to proposed trademarks, service marks, trade dress, slogans, ads and ad campaigns, etc.), sales, business contracts, systems, business plans, product plans, financial information, or any other information relating in any way to the Proprietary Subject Matter, Purpose and/or the Use (collectively, "Confidential Information"). Each party acknowledges and agrees that all Confidential Information is very valuable to the other party and is confidential and a trade secret of the other party and will be protected by civil and criminal law and shall maintain all Confidential Information in confidence.

    **(ii) Exceptions to Confidential Information**. Confidential Information shall not include information that: i) is or becomes public domain information through no fault or breach on the part of the receiving party; ii) as demonstrated by the receiving party's written records and documentation, was already lawfully known to the receiving party prior to the information being disclosed to the receiving party by the disclosing party, or any agent or representative of disclosing party; iii) as demonstrated by receiving party's written records and documentation, has been or is hereafter rightfully furnished to the receiving party without restriction on disclosure by a third person lawfully in possession thereof; or iv) as demonstrated by receiving party's written records and documentation, has been independently developed, by or for receiving party, without reference to Confidential Information. It shall be presumed that any information in the possession of receiving party that has been disclosed to it by the disclosing party, or any agent or representative of the disclosing party, is not within any of the exceptions to the definition of Confidential Information set forth in the previous sentence, and the burden is on the receiving party to prove otherwise by written records and documentation.

    **(iii) Use of Confidential Information**. Company and Consultant may only use Confidential Information in connection with the Services (collectively the "Business Purpose"). Company and Consultant will not use any Confidential Information for the benefit of anyone other than the Company or the Consultant. Neither party shall copy, reprint, duplicate, summarize or recreate in whole or in part, alone or in combination with anything else, the Confidential Information of the other party, whether in oral, written or electronic form, without the prior express written consent of an authorized representative

4

of the disclosing party, except such as necessary for Company's or Consultant's internal communications in connection with the Business Purpose.

**(iv) Duty to Protect Confidential Information**. Each party shall use best efforts, but in any event no less than the same degree of care that it uses to protect its own confidential and commercially valuable information (which shall in no event be less rigid than industry "best practices" for similar confidential or proprietary information), to prevent the unauthorized use, disclosure, publication or dissemination of Confidential Information receiving party agrees to accept the Confidential Information of the other party solely for the Business Purpose. Neither party shall publish, disseminate, or disclose any Confidential Information to any third party, including but not limited to its employees (except those with a valid basis for needing to know such information in the course of their employment in connection with the Business Purpose) and/or subcontractors, if any; and only if such third party has entered into a fully executed Non-Disclosure and Confidentiality Agreement with the receiving party, and receiving party shall be jointly and severally liable for disclosures to any such third party as if the receiving party had made such disclosures. Nothing in this Agreement shall preclude the receiving party from disclosing Confidential Information to the extent and only to the extent required to be disclosed in a judicial or administrative proceeding, or as otherwise required to be disclosed by law; but in any such case only after reasonable legal remedies for maintaining such information in confidence have been exhausted, including, but not limited to, giving the disclosing party as much advance notice of the possibility of such disclosure as practical so the disclosing party may attempt to stop such disclosure or obtain a protective order concerning such disclosure.

**(v) Termination**. The requirements set forth herein, including the receiving party's obligations regarding the use and treatment of Confidential Information shall survive the termination of this agreement or any applicable Scope of Work for two (2) years from the date of signing of this agreement, unless both parties otherwise agree in writing upon a different term.

**(B) Proprietary Rights.**

**(i) Ownership of Confidential Information**. All Confidential Information, and any Derivatives (as defined below) thereof, remains the property of the Company, and no license or other rights to Confidential Information is granted or implied hereby. For purposes of this Agreement, "Derivatives" shall mean: (i) for copyrightable or copyrighted material, any translation, abridgement, revision or other form in which an existing work may be recast, transformed or adapted; (ii) for patentable or patented material, any improvement thereon; and (iii) for material which is protected by trade secret, any new material derived from such existing trade secret material, including new material which may be protected by copyright, patent and/or trade secret. At the request of the Company: (a) Consultant will promptly redeliver to the Company all written or electronic copies of Confidential Information, Derivatives, and any or any other written or electronic copies of material containing or reflecting Confidential Information or Derivatives and will not retain any copies thereof and (b) documents, memoranda and notes prepared by consultant based

on Confidential Information shall be destroyed and Consultant shall provide the company with a certificate of destruction. Consultant will return all tangible Confidential Information, including, but not limited to all computer programs, documentation, notes, plans, drawings, and copies thereof, in whatever format or medium, to the Company immediately upon the Company's written request.

**(ii) Work-for-Hire**. Except for the Consultant's tools, processes, pre-existing materials and methodologies (collectively, the "Consultant Materials") which the Company acknowledges and agrees are owned by the Consultant, the Company shall be entitled to and shall own all of the results, proceeds, and work product of Consultants Services produced for the Company under the scope of work defined herein (hereinafter referred to in the aggregate as the "Invention") throughout the world in perpetuity (including, but not limited to, all copyrights, trademarks, patents and other intellectual property, and all other rights, throughout the world in any and all media, and via reproduction by any art or method, whether now known or hereafter devised) whether such results and proceeds consist of attorney work product, literary (including but not limited to articles), dramatic, or any other form of works, ideas, themes, compositions, methods, inventions, creations, and/or products, and without obligation to pay any fees, royalties or other amounts except those expressly provided for in this Agreement. Consultant acknowledges that any copyrightable subject matter, and all elements thereof, created by Consultant in connection with the Business Purpose or otherwise within the scope of Consultant's engagement under this Agreement is deemed a "work-made-for-hire" under the U.S. Copyright Act of 1976, as amended, and the Company shall be deemed the sole author and owner thereof for any purposes whatsoever, throughout the world, in perpetuity, and in any and all languages and in any and all media now known or hereafter created; provided that, to the extent that, in spite of the foregoing, any such copyrightable subject matter is not considered a "work-made-for-hire," all right, title and interest (including all renewal rights) in such copyrightable subject matter is hereby deemed assigned by Consultant to the Company in exclusivity and in perpetuity. In the event that the Company shall desire to secure separate assignments of any of the foregoing, Consultant agrees to execute them upon the Company's request. Consultant agrees and understands that compliance with the covenants and agreements contained in this Section 7(b)(ii) is not conditioned upon the payment of any additional or special consideration. All rights granted or agreed to be granted to the Company in this Section 7(b)(ii) shall vest in the Company immediately and in perpetuity and shall remain vested in the Company and the Company's successors and assigns whether this Agreement expires in normal course or whether Consultant's engagement hereunder is sooner terminated for any cause or reason.

**(iii)** No portion of this Agreement is intended to limit Consultant's ability to use its own proprietary techniques for web design, development, or marketing in the provision of services for other Clients.

This Section is effective as of the date Consultant first performed Services, or the Effective Date, whichever is earliest. The obligations of this Section shall continue beyond expiration of the Term, and shall be binding upon Consultant's successors, executors, administrators, and other legal representatives. To the extent that Consultant incorporates into any Company product, process, machine, technology, or invention that was already owned by Consultant (a "Pre-Existing

Material"), the Company shall have a non-exclusive, royalty-free, irrevocable, perpetual, transferable, sublicensable, worldwide license to the product created by the Consultant for the Company under this scope of work to make, have made, modify, use, and sell such prior product as part of or in connection with such Pre-Existing Material.

## 7. LIMITATIONS OF LIABILITY.

Neither party shall hold the other Party's employees, agents, officers or owners liable for any damages relating to any failure related to the product or services contemplated under this Agreement, except in the case of an intentional action or inaction and / or gross negligence. Except as expressly set forth in this Agreement or otherwise agreed to in writing between the parties, the Services are provided without warranties or conditions, either express or implied, including warranties or merchantability or fitness for a particular purpose.

UNDER NO CIRCUMSTANCES SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), ARISING FROM ANY PROVISION OF THIS AGREEMENT SUCH AS, BUT NOT LIMITED TO, LOSS OF REVENUE OR ANTICIPATED PROFITS OR LOST BUSINESS;PROVIDED THAT THIS SECTION DOES NOT LIMIT EITHER PARTY'S LIABILITY TO THE OTHER FOR (A) WILLFUL AND MALICIOUS MISCONDUCT; (B) DIRECT DAMAGES TO REAL OR TANGIBLE PERSONAL PROPERTY; (C) BODILY INJURY OR DEATH CAUSED BY NEGLIGENCE; OR (D) INDEMNIFICATION OBLIGATIONS HEREUNDER.

**Limited Waiver**. Company hereby grants to Consultant a limited waiver of sovereign immunity with respect to the following purposes and for no others:

   a. For the purpose of allowing Consultant to take any and all actions necessary to enforce the provisions of this Agreement.

   b. For the purpose of permitting Consultant to provide the services as set forth and described within the Agreement.

   c. Subject to this Section (Limited Waiver), pursuant to its limited waiver, Company expressly waives its immunity for the limited purposes of dispute resolution and enforcement of the Agreement and enforcement of any award resulting therefrom in the Federal Courts of the State of Wisconsin sitting in or near Waukesha County, and the United States District Court and Federal Appellate Courts therefrom, or if such courts shall not have jurisdiction, the Wisconsin state courts in Waukesha County, and appellate courts therefrom (collectively, the "Permitted Forums").

   d. Notwithstanding any other provision of the Agreement (including any exhibits or addenda thereto), Company (i) does not consent to jurisdiction or venue in any court, tribunal or other forum, except for Permitted Forums and (ii) does not consent

7

to any dispute resolution forum or procedure, except as expressly set forth in the Agreement.

## 8. TAXES.

(a) The Fees are exclusive of any sales, use, personal property, value added and goods/services taxes.

(b) Notwithstanding the foregoing, the Company shall not be responsible for any taxes based on the Consultants net income or receipts, or such other taxes based on the Consultant doing business in any particular jurisdiction.

## 9. REPRESENTATIONS AND WARRANTIES.

(a) The Consultant represents and warrants that the Services, and any Additional Services, performed pursuant to this Agreement shall be performed in accordance with best industry standards, due care and skill.

(b) Consultant represents and warrants to Company that: (i) neither Consultant's execution of this Agreement nor Consultant's performance of the Services required of Consultant hereunder will violate, conflict with or result in a breach of (A) any provision of, or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) under, any contract or other obligation to which Consultant is a party or by which Consultant is bound, or (B) any judgment or other order applicable to Consultant; and (ii) in performing the Services, Consultant shall not utilize, in violation of applicable law or the rights of any third party, any materials, forms, manuals, documents or other information that constitutes trade secrets or confidential information of such third party.

(c) The Consultant hereby represents and warrants that the Services, any Additional Services, the products, the Consultant Materials and any information, material, products, designs, specifications or instructions provided by the Consultant, or the use of any of the foregoing, do not infringe any patent, utility model, industrial design, copyright, trade secret, trademark or any other third party intellectual property right or right of confidentiality.

(d) Company represents and warrants that any elements of text, graphics, photos, designs, trademarks, or other artwork that is provided to Consultant are either owned by the Company or that the Company has rights to use.

(e) Consultant does not provide any copyright or trademark protection or registration services as part of this Agreement.

The Company understands and agrees that Consultant may use original images and artwork as much as possible. The foregoing notwithstanding, Consultant represents and warrants that the Services, Additional Services, Consultant Materials, work product, designs, or any text, graphics, photos, designs, trademarks, videos or other copyrightable content or materials not provided to Consultant by Company, shall not infringe any patent, copyright or other intellectual property right

8

of any third party. Consultant shall hold Company harmless against and handle, defend or settle any claim, demand, suit or proceeding brought against Company or Company's affiliates that is based on an allegation that any article, content, material, component, element or part thereof constituting the Services, as well as any article, device or process resulting from the intended use thereof or any process or method furnished by Consultant for making or using the Services, constitutes an infringement of any patent, copyright, trademark or other intellectual property right.

(f)Neither Party shall take any action to circumvent or avoid any obligation required herein. The Termination Fee as set forth in paragraph 2 herein shall apply to any violation of this section.

(g) Company hereby agrees that this transaction is being entered into for the economic benefit of Company and the Rosebud Sioux Tribe shall share in any economic benefit or revenue of Company relating to the loan portfolios funded by, or supplemented by, any lender Consultant introduces to Company pursuant to this Agreement.

## 10. PUBLICITY.

Neither party shall use the name of the other party or any of its affiliates in any sales or marketing publication or advertisement or make any public disclosure except as may be legally required, relating to this Agreement or the other party or any of its affiliates, without obtaining the prior written consent of the other party.

## 11. NONSOLICITATION.

(a) During and for a period of six (6) months following termination of this Agreement, each party will not, without prior written consent of the other party, solicit any employee of the other party or its subsidiaries or affiliates, who were involved in the performance of services hereunder. The Termination Fee as set forth in paragraph 2 herein shall apply to any violation of this section.

## 12. INDEMNIFICATION.

Each party agrees to indemnify, defend and hold harmless the other party, its officers, directors, employees, affiliates and sub-consultants against any and all claims by third parties involving damages, liabilities, or costs, including reasonable attorney fees and defense costs, arising out of or directly related to such party's performance of its obligations under this Agreement. In the event both parties are subject to the same or similar claim by a third party, Company shall indemnify the Consultant for the damages, liabilities and costs set forth herein.

## 13. GENERAL PROVISIONS.

**(a) Section Headings**. Section headings are for convenience only and shall not be a part of this Agreement.

**(b) No Waiver**. A waiver of a breach or default under this Agreement shall not be a waiver of any other or subsequent breach or default. The failure or delay in enforcing compliance with any term or condition of this Agreement shall not constitute a waiver of such term or condition unless such term or condition is expressly waived in writing.

9

**(c) Transfer and Severability**.  Neither party may transfer or assign this agreement to anyone else without the other party's express written permission.

**(d)** The Parties acknowledge and agree that the restrictive covenants and provisions contained herein are reasonable and valid in scope and in all other respects, and do not impose limitations greater than are necessary to protect the goodwill, proprietary information, and other business interests of the other Party. Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law. If in spite of the foregoing, any provision of this Agreement shall be judged invalid, illegal, or unenforceable in any applicable jurisdiction, such provision shall be restricted or deleted in such jurisdiction only to the extent necessary to make such provision valid, legal, and enforceable in such jurisdiction, and the validity, legality, and enforceability of such provision in any other jurisdiction, or of any of the other provisions of this Agreement in all jurisdictions, shall not in any way be affected or impacted thereby.

**(e) Modification**. No modification, waiver or amendment of any term or conditions of this Agreement shall be effective unless and until it shall be reduced to writing and signed by both of the parties hereto or their legal representatives.

**(f) Survival**. The provisions of this Agreement that by their nature and content are intended to survive the performance hereof, shall so survive the completion and termination of this Agreement and any other agreement between Consultant and the Company. Without limiting the generality of the foregoing, Sections 5, 7, 8, 9, 10, 11, 12, and 13 of this Agreement shall so survive.

**(g) Rights of the Parties**. No person who is not a party to this Agreement shall gain any rights hereunder or be able to enforce any provision of this Agreement.

**(h) Governing Law/Disputes**.   This Agreement shall in all respects be governed by the laws of the State of Wisconsin applicable to agreements executed and wholly performed within such State, without regard to any conflict of laws principles thereof. The Parties shall first use non-binding mediation in an attempt to resolve any disputes between themselves relating to the terms of this Agreement.  In the event that non-binding mediation fails, the federal courts situated in Wisconsin shall have exclusive jurisdiction over any disputes arising hereunder, and venue shall be deemed proper in the federal courts in Wisconsin, as applicable, or as otherwise defined by this Agreement.

**(i) Waiver of Jury Trial**. The Consultant and the Company hereby agree to voluntarily waive their respective rights to a jury trial of any claim or cause of action based upon or arising out of this Agreement, the relationship between them, or any dealings between them relating to the subject matter of this Agreement or such relationship. The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court or that relate to the subject matter of this Agreement, including, without limitation, contract claims, tort claims, breach of duty claims, wrongful termination claims, claims for discharge in violation of public policy, claims of discrimination and all other common law and statutory claims, to the maximum extent permitted by law. The Parties each acknowledge that this waiver is a material inducement to enter into this Agreement, which each has already relied on the waiver in entering into this Agreement, and that each will continue to rely on the waiver in their related future dealings.

10

**(j) Entire Agreement**. This Agreement contains the full and complete understanding and agreement between the parties with respect to the within subject matter and supersedes all other agreements whether express or implied between the parties whether written or oral relating thereto, and may not be modified or amended except by a written instrument executed by both of the parties hereto.

**(k) Notice**. All notices or other communications by a party to this Agreement (the "Notice-Giving Party") that are required or permitted in connection with this Agreement shall be in writing and deemed to have been duly given at the time of receipt if delivered personally or via overnight express, or three (3) days after being mailed via registered or certified mail to the other party's address as listed below; or, immediately upon confirmed transmittal by e-mail or fax to an e-mail or fax address provided by the receiving party in writing for such purpose. All notices required or permitted by this Agreement shall be directed to the other Party at the address below or at such other address of which the notifying Party hereafter receives notice in conformity with this Section.

> To Consultant:    Mineral Point Consulting LLC
> 320 Gold Ave. SW, Suite 620 PMB 1875
> Albuquerque, NM  87102
>
> Email: eric@mineralpointconsulting.com
>
> To Company:    Benhti Economic Development Corporation
> 100 Cushman Street, Suite 306
> Fairbanks, AK  99710
>
> P.O. Box 74598
> Fairbanks, AK  99707
>
> Email: gm@bedco.us

**(l) Counterparts/Signature Delivery**. This Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute a single agreement. A signature delivered via facsimile, email, or attachment to email shall be equally as effective as an original signature delivered in-person, via mail, or via any other means.

**IN WITNESS WHEREOF**, the parties hereto, through their duly authorized officers, via Resolution No. 2022-18 (attached), have executed this Agreement as of the Effective Date set forth above.

| Company: | Consultant: |
|---|---|
| By: *[signature]* | By: *[signature]* |
| Name: Melvin Charlie | Name: Eric Lochen |
| Title: Board Chair | Title: Consultant |
| | |
| | |
| | |

12

# APPENDIX A – Statement of Work

# Services to be Provided and Fee

1. **Performance of Duties**. The Consultant agrees to perform assigned duties and obligations well and faithfully and to the utmost of its ability.

2. **Scope of Duties.** The Consultant's duties will include:

   - Review and consult on management of all operations performed to date by the Company, with particular regard to, though not limited to,managing its consumer lending operations and recommend enhancements to Company's reporting, regulatory, compliance, audit, business functions, legal issues, and any and all other aspects of such entities.
   - Consultant will participate in regular video conference calls or in-person meetings with the Company management to create project plans and tactical implementation plans for proposed analyses and changes to Company's lending platforms, consumer lending operations, regulatory, compliance, examination, audit and risk management approaches.
   - The Company and Consultant will jointly evaluate all consumer and regulatory matters, implement issue avoidance protocols, and work together to develop responses to same. Consultant shall hire and interface with outside counsel on behalf of the Company to resolve consumer complaints, regulatory matters and prepare regulatory audit responses on behalf of at the expense of the Company.
   - Consultant will assist in the engagement of third-party legal counsel for Company, including the management of such engagement and will interface with said legal counsel on all relevant matters, inclusive of any litigation, and provide periodic reports to Company regarding any ongoing matters and will work with Company to obtain the most favorable outcome possible in the event of any litigation. In the event that Company forms new businesses at a later date, the parties agree to negotiate in good faith supplemental or additional agreements to account for additional Consultant time. In addition, the Consultant shall, at the request of the Company, provide Additional Services to the Company, which shall be covered under this Agreement, with such services, including any payment for such services, as may be agreed to by the parties at such time.
   - Other analyses and model development as reasonably requested by the Company as Company develops new infrastructure and revenue streams.
   - Consultant shall oversee and provide consulting services, including management and supervisory services, to Company staff, for purposes of managing workflow and training employees in various aspects of Company business.
   - Provide the same or similar services to other non-lending businesses owned and operated by the Company, subject to duly adopted approval protocols.

3. **Payment for Duties**. Consultant will be compensated as follows:

- Consultant will be paid a monthly fee equal to three quarters of one percent (.075%) of the then current monthly net revenue—defined as monthly gross revenue minus bad debt—of Minto Financial and Tolovana Financial and any other newly chartered Company subsidiaries formed for the purposes of lending and serviced by Next Level Servicing, Inc., during every month of the Term of this Agreement, to be paid from the monthly Equity Success Fee generated by Company's business serviced by Next Level Servicing, Inc., as it is defined in certain respective Services Agreements by and between Minto Financial and Next Level Servicing, Inc., and Tolovana Financial and Next Level Servicing, Inc. The monthly .075% fee shall be calculated as of the close of business each month that an outstanding balance remains on any loan or line of credit between Company and any lender introduced to Company by Consultant, including without limitation Mecca Capital, Inc. Company will provide Consultant with monthly verification and access to any and all financial reports and other information needed to calculate Consultant's monthly fee. Consultant's fee is due and payable on the 15th day following the close of every month during the Term of this Agreement. In the event that additional services for entities of Company are agreed upon between the Consultant and Company, the parties shall do so in writing describing the additional assignments, including the fees and schedule for that specific assignment and/or entity. In addition to the fee described herein, Consultant shall be reimbursed for travel expenses by Company for those travel expenses incurred by Consultant for Company meetings and the like.

# EXHIBIT B

BENHTI ECONOMIC DEVELOPMENT CORPORATION

BOARD OF DIRECTORS

RESOLUTION NO. 2022-18

RESOLUTION TO APPROVE EXECUTIVE MANAGEMENT CONSULTANT
ENGAGEMENT AND MANAGEMENT SERVICES AGREEMENT

WHEREAS: The Minto Tribal Council is the official and governing body of and for the Native
Village of Minto; and

WHEREAS: Under the Constitution and Charter of the Native Village of Minto, the Village
shall have the power to enter into any business or activity that will better the
condition of the Village and its members; and

WHEREAS: Under the Constitution and Charter of the Native Village of Minto, the Village
shall have the power to do such other things as may be necessary to carry on the
business and activities of the Village; and

WHEREAS: The Minto Constitutional Act, adopted March 1, 2006, references the fact that the
"Native Village of Minto" and the "Minto Tribe" are one in the same, and
establishes the Minto Tribal Council as the governing body of the Minto Tribe;
and

WHEREAS: The Minto Tribal Council, at a duly called meeting held October 2, 2018, with a
quorum present, passed the motion to authorize and approve the Charter of the
Benhti Economic Development Corporation ("BEDCO") and appoint BEDCO
Board of Directors ("BEDCO Board"); and

WHEREAS: The BEDCO Board held a duly called meeting on the 12th day of November 2018,
whereby a quorum was present; and

WHEREAS: The BEDCO Board exercised its Powers under Sect. 4.8 of the BEDCO Charter
to charter MINTO FINANCIAL as a subsidiary organization; and

WHEREAS: The BEDCO Board, under Sect. 10.1 of the BEDCO Charter, shall serve as the
Board of Directors for any subsidiary organizations formed as may be appropriate
to the business of BEDCO under Sect. 4.8 of the BEDCO Charter, including
MINTO FINANCIAL, until such time that it is feasible to appoint a separate
oversight Board or Committee; and

WHEREAS: The BEDCO Board held a duly called meeting on the 3rd day of June 2022,
whereby a quorum was present; and

WHEREAS: The BEDCO Board exercised its Powers under Sect. 4.8 of the BEDCO Charter
to charter TOLOVANA FINANCIAL as a subsidiary organization; and

·1

WHEREAS: The BEDCO Board, under Sect. 10.1 of the BEDCO Charter, shall serve as the Board of Directors for any subsidiary organizations formed as may be appropriate to the business of BEDCO under Sect. 4.8 of the BEDCO Charter, including TOLOVANA FINANCIAL, until such time that it is feasible to appoint a separate oversight Board or Committee; and

WHEREAS: the BEDCO Board shall have the authority and power to waive BEDCO's sovereign immunity in a manner prescribed via the BEDCO Charter, not inconsistent with BEDCO Bylaws adopted by the BEDCO Board, PROVIDED that the BEDCO Board shall have NO authority to waive the sovereign immunity of the Tribe, nor create any liability or debt on the part of the Tribe, nor shall the BEDCO Board have any authority to waive the sovereign immunity of BEDCO, nor create any liability or debt on the part of BEDCO; and

WHEREAS: The BEDCO Board has the authority to review existing contracts and enter into contracts with any person, partnership, or Corporation or delegate this authority as the Board deems appropriate, which power the BEDCO Board has continuously and openly exercised since on or about the date of the effectiveness of the BEDCO Charter; and

WHEREAS: The BEDCO Board has reviewed, has been provided reasonable opportunity to review, and otherwise been advised by Management and Legal Counsel on the attached Executive Management Consultant Engagement and Management Services Agreement ("Agreement"), which would provide BEDCO and BEDCO subsidiaries—including without limitation MINTO FINANCIAL and TOLOVANA FINANCIAL—with services that include those defined within Appendix A of the attached Agreement; and

WHEREAS: Mineral Point Consulting LLC is in the business of providing management consulting services for all operations of the Company in managing its economic development and consumer lending operations, including without limitation regulatory, compliance, audit, business functions, legal issues, and other services for all aspects of such entities; and

WHEREAS: BEDCO is in the business of developing new economic development opportunities that benefit the Native Village of Minto; and

WHEREAS: BEDCO subsidiaries MINTO FINANCIAL and TOLOVANA FINANCIAL are in the business of consumer lending, which provides substantial economic benefit to the Native Village of Minto; and

WHEREAS: BEDCO desires to retain Mineral Point Consulting LLC to provide certain business management, legal, and other consulting services as defined in the attached Agreement; and

2

WHEREAS:   The proposed terms of the Vendor Services Agreement have been presented to the
BEDCO Board, and

WHEREAS:   The BEDCO Board desires to (a) approve the execution and delivery of final
forms of the attached Agreement on behalf of BEDCO, MINTO FINANCIAL,
TOLOVANA FINANCIAL, and any newly formed BEDCO subsidiaries; and
(b) authorize the transactions contemplated by the attached Agreement; and

WHEREAS:   The BEDCO Board held a duly called meeting on the 1st day of December 2022,
whereby a quorum was present;

NOW THEREFORE BE IT RESOLVED:

Section 1.     Recitals; Findings.  The BEDCO Board hereby determines and finds that (a) the
WHEREAS clauses in this Resolution are true and correct in all material respects; (b) the
BEDCO Board is the duly elected and governing body of BEDCO, with full power and
authority to adopt this Resolution; and (c) the BEDCO Board's adoption of this
Resolution is in the best interest of BEDCO.

Section 2.     Approval of Documents and Certain Provisions of such Documents.  The BEDCO
Board hereby acknowledges that Proposed Terms have been presented or made available
to the BEDCO Board, and the BEDCO Board hereby authorizes and approves the
execution, delivery, and performance by BEDCO of the final forms of the attached
Vendor Services Agreement, which may contain such changes as an Authorized
Representative (as defined below) reasonably determines to be necessary or appropriate
to close the transactions contemplated in this Resolution.

Section 3.     Limited Waiver of Sovereign Immunity and Exhaustion of Tribal Remedies.  The
BEDCO Board hereby approves and affirms the limited waiver of BEDCO and BEDCO
subsidiaries' sovereign immunity pursuant to Section 7 of the attached Agreement.

Section 4.     Authorization of BEDCO Board Representative.  The BEDCO Board hereby
grants to the General Manager of BEDCO, or if he/she is unavailable, any such other
person permitted by the law to act in the Chairperson's stead (the Chairperson and each
such other BEDCO Board Member or person being an **"Authorized Representative"**),
all requisite authority and power for and on behalf of BEDCO to execute and deliver the
Vendor Services Agreement and all other documents necessary to effectuate such
agreements (collectively, the **"Approved Documents"**), in such form as an Authorized
Representative may approve, which approval shall be conclusively demonstrated by an
Authorized Representative's execution and delivery of the same.  Each Authorized
Representative is further authorized, empowered and directed to take or to cause staff of
BEDCO to take such further and additional action as such Authorized Representative
reasonably determines to be necessary or appropriate and in the interest of BEDCO to
complete the transactions contemplated in this Resolution.  All acts and deeds previously
undertaken by any Authorized Representative for and on behalf of BEDCO in carrying

3

out the terms, purposes, and intentions of this Resolution are hereby ratified and confirmed.

Section 5.    <u>Determination</u>. The BEDCO Board hereby determines that no law, ordinance, rule, regulation, resolution, or other action of the BEDCO Board or any of the agencies or instrumentalities of BEDCO, either written or established by custom or tradition: (a) prohibits the BEDCO Board from approving the matters herein approved, or the execution, delivery, or performance of any Approved Documents, or the consummation of the transactions contemplated therein; or (b) creates any obligation of BEDCO to submit these matters for approval of or consent from any officer, body, agency, or instrumentality of BEDCO or the Tribe, or any vote by members of the Tribe, except for such approvals and consents that have already been obtained and are in full force and effect.

Section 6.    <u>Repeal</u>. Any laws, ordinances, judgments, decisions, orders, resolutions, rules, regulations, or other actions of BEDCO or any instrumentality or agency of BEDCO (exclusive of the Tribe's Constitution), or any of the officers, employees, or agents, of the foregoing, whether written, unwritten, or established by tradition that are in effect and are in conflict with or inconsistent with the terms of this Resolution, the transactions contemplated herein, or any provision set forth in the Approved Documents, are hereby repealed and annulled to the extent of the conflict or inconsistency, and this Resolution shall supersede the same.

Section 7. <u>Miscellaneous</u>.

(a)    The foregoing resolutions are in addition to, and are not limited by, any resolutions heretofore adopted by the BEDCO Board.

(b)    If any provision of this Resolution or the application of any provision of this Resolution is held to be invalid, the remainder of this Resolution will not be affected with respect to the same.

(c)    This Resolution will become effective as of the date and time of its passage and approval by the BEDCO Board.

*THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK*

## CERTIFICATION

I, as undersigned Secretary/Treasurer of the BEDCO Board, hereby certify that this
Resolution was adopted by the vote of: 3 For; 0 Against; 0 Abstain; 0 Not Voting; during a
duly called meeting, held on the 1<u>st</u> day of <u>December,</u> 2022.

_____

Secretary/Treasurer
BEDCO

<u>Attest</u>

_____

Chairperson
BEDCO

5

# EXHIBIT C

**Billed To**
Kristi Weiss-Ackels
BEDCO / Minto Financial /
Tolovana Financial
205 Lakeview Drive
Minto, AK  99758

**Date of Issue**
05/09/2025

**Due Date**
05/15/2025

**Invoice Number**
052334

**Amount Due (USD)**
# $90,549.57

| Description | Rate | Qty | Line Total |
|---|---|---|---|
| Consulting Services<br>April 2025 Executive Management Consulting fee<br>MF: $51,353.70<br>TF: $39,195.87 | $90,549.57 | 1 | $90,549.57 |

| | |
|---|---|
| Subtotal | 90,549.57 |
| Tax | 0.00 |
| Total | 90,549.57 |
| Amount Paid | 0.00 |
| Amount Due (USD) | $90,549.57 |

**Terms**
Invoice due upon receipt in accordance with contractual terms.

# EXHIBIT D

**Billed To**
Kristi Weiss-Ackels
BEDCO / Minto Financial / Tolovana
Financial
205 Lakeview Drive
Minto, AK  99758

**Date of Issue**
06/09/2025

**Due Date**
06/15/2025

**Invoice Number**
052337

**Amount Due (USD)**
## $101,913.12

| Description | Rate | Qty | Line Total |
|---|---|---|---|
| Consulting Services<br>May 2025 Executive Management Consulting fee<br>MF: $55,896.50<br>TF: $46,016.62 | $101,913.12 | 1 | $101,913.12 |

| | | |
|---|---|---|
| Subtotal | 101,913.12 |
| Tax | 0.00 |
| Total | 101,913.12 |
| Amount Paid | 0.00 |
| Amount Due (USD) | $101,913.12 |

**Notes**
Please note: Invoice 052334 remains unpaid and outstanding. Interest and fees on all overdue amounts shall continue to accrue in accordance with the Agreement between the parties.

**Terms**
Invoice due upon receipt in accordance with contractual terms.

# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

|  |  |
|---|---|
| Mineral Point Consulting LLC <br><br> _Plaintiff(s)_ <br><br> v. <br><br> Benhti Economic Development Corporation <br><br> _Defendant(s)_ | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Action No. 2:25-cv-868 |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_    Benhti Economic Development Corporation
100 Cushman Street, Suite 306
Fairbanks, Alaska 99710

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you receive it) – or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) – you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or the plaintiff's attorney, whose name and address are:

Mark Vyvyan - Counsel of Record for Plaintiff Mineral Point Consulting LLC
Fredrikson & Byron, P.A.
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

_GINA M. COLLETTI, CLERK OF COURT_

Date: _____          _____

_Signature of Clerk or Deputy Clerk_